**ILLINOIS BELL TELEPHONE COMPANY, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America.**

Nos. 88–1175, 89–1241.

United States Court of Appeals, District of Columbia Circuit.

Argued March 13, 1990.

Decided Aug. 17, 1990.

Alfred Winchell Whittaker, with whom Katherine C. Zeitlin and Floyd S. Keene, for Illinois Bell Telephone Co., et al., William B. Barfield and R. Frost Branon, Jr., for BellSouth Corp., William C. Sullivan, Richard C. Hartgrove, and Patricia J. Nobles, for Southwestern Bell Telephone Co., Martin T. McCue for U.S. Telephone Ass'n, and Dana B. Rasmussen and Robert B. McKenna, for Mountain States Tel. & Tel. Co., et al., were on the joint brief, for petitioners and supporting intervenors in 88–1175 and 89–1241. Melanie S. Fannin, for Southwestern Bell Telephone Co., also entered an appearance, for petitioners and supporting intervenors.

Linda L. Oliver, Atty. for F.C.C., with whom Robert L. Pettit, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel for FCC, James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and Robert J. Wiggers, Dept. of Justice, were on the brief, for respondents in both cases. Diane S. Killory, Atty. for F.C.C., also entered an appearance, for respondents.

David Casson and L. Marie Guillory were on the brief, for intervenor Nat. Telephone Co-op. Ass'n in No. 89–1241. Denise M. Drialo also entered an appearance, for intervenor Nat. Telephone Co-op. Ass'n.

Jules M. Perlberg, Francine J. Berry, and Marc E. Manly entered appearances, for intervenor AT & T in Nos. 88–1175 and 89–1241.

James R. Young, David K. Young, and Thomas L. Welch entered appearances, for intervenor Bell Atlantic Telephone Co. in Nos. 88–1175 and 89–1241.

J. Richard Devlin, Carolyn C. Hill, and James T. Roche entered appearances, for intervenor United Telephone System Companies in Nos. 88–1175 and 89–1241.

Saul Fisher, Mary McDermott, and Martin J. Silverman entered appearances, for intervenor NYNEX Telephone Co. in Nos. 88–1175 and 89–1241.

Robert L. Barada, Nancy K. McMahon, and Stanley J. Moore entered appearances, for intervenors Pacific Bell and Nevada Bell in No. 88–1175.

Richard McKenna and Gail L. Polivy entered appearances, for intervenor GTE Service Corp. in No. 88–1175.

Martin T. McCue entered an appearance, for intervenor U.S. Telephone Association in No. 89–1241.

John C. Wohlstetter entered an appearance, for intervenor Contel Corp. in No. 89–1241.

Before BUCKLEY, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The petitioners seek review of an order of the Federal Communications Commission modifying the rules for determining the interstate rate base of so-called dominant telecommunications carriers, *viz.* all local exchange telephone companies, AT & T, and certain international carriers. The Commission excluded from the rate base certain categories of assets that it deemed not "used and useful" in providing telephone service. The petitioners argue that, as a result, they are deprived of a reasonable return on their investment, and thereby suffer an unconstitutional deprivation of property in violation of the Fifth Amendment to the United States Constitution, and further that the Commission acted in an arbitrary and inconsistent manner in excluding certain costs. We grant the petition for review with respect to certain of the exclusions, and remand for the Commission more adequately to account for those aspects of its decision.

## I. BACKGROUND

A regulated utility's rate of return (r), multiplied by its rate base (I), plus its operating costs and taxes (C), determine its revenue requirement (R); thus, $I \times r + C$

= R, which it recovers through a rate structure calculated to yield that amount. *See generally* S. BREYER & R. STEWART, ADMINISTRATIVE LAW & REGULATORY POLICY 224 (2d ed. 1985). The rate of return, which is based upon the utility's embedded cost of debt and estimated cost of equity capital, as calculated by the regulator, is set at the minimum level necessary for the utility to maintain its credit and attract the capital needed to provide service. *See United States v. FCC*, 707 F.2d 610, 612 (D.C.Cir.1983); *see also American Tel. & Tel. Co.*, 57 F.C.C.2d 960, 960–61, ¶ 2 (1976) (rate of return set at "lowest possible cost consistent with [utility's] overall responsibility to provide modern, efficient service at reasonable rates and to maintain the financial integrity of the enterprise").

In 1977, the Commission elaborated upon the specific principles by which it would determine the interstate rate base component of the formula set out above for the purpose of regulating the interstate services of the unified Bell System. *See In re American Tel. & Tel. Co.—Charges for Interstate Telephone Service: Phase II Final Decision and Order*, 64 F.C.C.2d 1 (1977) ("*Docket 19129 Order*"), *on recon.*, 67 F.C.C.2d 1429 (1978) ("*Docket 19129 Reconsideration Order*"). It decided then to adhere to its long-established principle of including in the rate base only property that is "used and useful" in providing service to ratepayers, *i.e.*, is "necessary to the efficient conduct of a utility's business, presently or within a reasonable future period," *Docket 19129 Order* at 47, ¶ 111; thus, it rejected AT & T's proposed "balance sheet analysis" approach, under which the rate base would include all investor-supplied capital, *id.* at 48, ¶ 116, because that "would require ratepayers to pay a return to AT & T's investors on capital which to the ratepayers is non-productive," *id.* at 49, ¶ 118. Such a requirement would conflict with the principle that the cost of investments should be paid by ratepayers only "insofar as the invested capital is used directly for the benefit of the ratepayer." *Id.*

In 1987, three years after the breakup of AT & T, the Commission reexamined and revised its rules for calculating the rate base used to determine the interstate revenue requirement of dominant telecommunications carriers. *See In re Amendment of Part 65 of the Commission's Rules to Prescribe Components of the Rate Base and Net Income of Dominant Carriers: Report and Order*, 3 FCC Rcd 269 (1987) ("*Rate Base Order*"), *on recon.*, 4 FCC Rcd 1697 (1989) ("*Reconsideration Order*"). Its objective was to "refine the rate base and net income principles previously established ... and incorporate any new principles necessary to reflect the current telecommunications industry environment." 4 FCC Rcd at 1697, ¶ 2 (footnotes omitted). The Commission decided to retain some previously determined exclusions from the rate base and newly to exclude certain additional elements. The petitioners challenge several aspects of the rules as revised in these rate base orders.

## II. ANALYSIS

The petitioners contend first that the new rules deprive telephone companies of a reasonable return on their investment, in violation of the fifth amendment, because they exclude from the rate base certain prudent investments, without increasing the rate of return to compensate for the risk of such disallowance. Second, they argue that the Commission applied the "used and useful" standard in an inconsistent and arbitrary fashion with respect to several particulars.

### A. *Constitutionality of the End Result*

■ The petitioners maintain that, if the Commission excludes from the rate base investments that are prudent when made although not, by the FCC's lights, "used and useful," while using a rate of return that was set at the "lowest possible" constitutional level and based upon the assumption that all prudent investments would be in the rate base, then the return on the carriers' prudently invested capital will decrease to a confiscatory level. "That is not conjecture; it is arithmetic," they say.

In reply, the Commission relies upon the principle that, in determining whether a ratemaking regulation results in an unconstitutional confiscation, the court is to consider only the "net effect," or "end result," of the ratemaking process. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 618–19, 102 L.Ed.2d 646 (1989); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *Jersey Central Power & Light Co. v. FERC*, 810 F.2d 1168, 1177 (D.C.Cir. 1987) (en banc). It contends that, because this proceeding was limited to determining what would be in the rate base (I), without regard to the rate of return (r) thereon, there is no way in which the court can presently determine whether the "end result" (I x r) will be confiscatory in application. Thus, it urges that the petitioners' challenge is not ripe, and will not be ripe until the FCC applies a particular rate of return, in a ratemaking case, to the rate base as it has been determined here. Commission counsel assured the court at oral argument that each dominant carrier will have an opportunity, in a ratemaking proceeding, to seek a risk premium in order to compensate it for the risk that prudent investments will be excluded from its rate base; indeed the argument has already been raised in one pending proceeding, *see Refinement of Procedures & Methodologies for Represcribing Interstate Rates of Return for AT & T Communications & Local Exchange Carriers*, CC Docket No. 87–463.

We agree with the Commission. Only when the composition of the rate base and the allowable rate of return—multiplicand and multiplier—are viewed in tandem can the court evaluate the product to determine whether it is confiscatory and therefore unconstitutional. This must need be so, because "[i]nconsistencies in one aspect of the methodology," seemingly of constitutional significance when viewed in isolation, "have no constitutional effect if they are compensated by countervailing factors in some other aspect." *Duquesne Light*, 109 S.Ct. at 619. Thus, the present rulemaking, in which no rates have been prescribed, does not provide us with a record

upon which to apply the end result test to the investors' return. Because the petitioners will have an opportunity to challenge the adequacy of the rate of return, as applied to the rate base, the constitutionality of the end result will not evade review. Accordingly, we hold that the constitutional issue is not ripe.

B. *Exclusion of Specific Items from the Rate Base*

■ We next consider those specific elements of the FCC's orders to which the petitioners object. In reviewing the Commission's rules for inclusion of an item in the rate base, in a context in which we have no basis for thinking that the end result will be unjust, we inquire only into whether the agency's rules are arbitrary or unreasonable. *See id.* at 620 (for court to impose particular ratemaking methodology would be inconsistent with principle that only end result need be fair); *NEPCO Municipal Rate Comm. v. FERC*, 668 F.2d 1327, 1333 (D.C.Cir.1981) (regulator may adopt "any method of valuation for rate base purposes so long as the end result of the rate order" is just and reasonable (quoting *Washington Gas Light Co. v. Baker*, 188 F.2d 11, 18 (D.C.Cir.1950))).

1. Telecommunications Plant Under Construction—Long Term (PUC–LT)

Reasoning that plant is not "used and useful" to ratepayers until it is in operation, the Commission adhered to its 1977 position and excluded from the rate base the construction cost of any project that will not be completed within one year; such excluded costs are aggregated in Account 2004, PUC–LT. *See Rate Base Order*, 3 FCC Rcd at 273, ¶ 31; *Docket 19129 Order*, 64 F.C.C.2d at 56–60, ¶¶ 140–54. The FCC permits interest on PUC–LT, at the prime rate, to accrue for future recovery through a so-called Allowance for Funds Used During Construction (AFUDC).

The petitioners contend first that PUC–LT should be included in the rate base. They argue that the Commission's policy of deferring its inclusion is arbitrary and unreasonable because (1) the Commission has

not explained why one year defines the outer limit of the "reasonable period" contemplated by the "used and useful" standard; and (2) it is inconsistent with the Commission's treatment of another account, Property Held for Future Use (PHFU), defined as property "owned and held for no longer than two years under a definite plan for use in telecommunications service," which may be included in a carrier's rate base, 47 C.F.R. § 32.2002(a). Additionally, they say that the policy harms ratepayers because it will result in higher rates.

They contend second that, if PUC–LT is to be excluded, then the Commission should accrue AFUDC at a higher rate than prime, and that the Commission was arbitrary and unreasonable in refusing to consider the case for a higher rate in this proceeding.

### a. *Exclusion of PUC–LT From the Rate Base*

In objecting that the differential treatment of PUC–LT and PHFU is arbitrary and unreasonable, the petitioners contend that "[i]f PHFU is used and useful, then PUC-[LT] must be used and useful as PUC-[LT] typically is closer in time to being included in Plant in Service." The Commission responds that the different treatment is justified by the different rationales for the two rules: PHFU is included in the rate base in order to encourage the carrier to acquire assets, such as land and buildings, before they are urgently needed, by which time their prices may have risen by more than the time value of their current prices. *See Docket 19129 Order*, 64 F.C.C.2d at 61, ¶ 155. For example, a carrier may include in the PHFU component of the rate base the cost of installing a cable when a street is being torn up, although the cable is not needed for up to two years, because it may thereby realize a "cost-savings opportunity." *Id.* PUC–LT, on the other hand, is excluded from the rate base in order to encourage the carrier, once it has begun a construction project, to complete it expeditiously. *See Rate Base Order*, 3 FCC Rcd at 273, ¶ 31.

It is not anomalous or unreasonable for the Commission to exclude PUC–LT from the rate base even though it may be closer in time to being put into service than PHFU, which is included in the rate base. Applying the principle that cost burdens should be matched with service benefits, the Commission includes in the rate base only property that it considers "necessary to the efficient conduct of a utility's business, presently or within a reasonable period." *See Notice of Proposed Rulemaking*, 2 FCC Rcd 332, 333, ¶ 8 (1987); *Docket 19129 Order*, 64 F.C.C.2d at 47, ¶ 111. The Commission has considerable discretion to determine the appropriate time, in advance of property going into service, at which it first becomes "necessary to the efficient conduct of a utility's business"; it may distinguish among various types of expenditures upon the basis of any relevant concern, including its concern with the differing incentives it has invoked in the cases of PUC–LT and PHFU. *See Aeronautical Radio, Inc. v. FCC*, 642 F.2d 1221, 1228 (D.C.Cir.1980) (FCC "has broad discretion in selecting methods for the exercise of its powers to make and oversee rates"); *cf. Communications Satellite Corp. v. FCC*, 611 F.2d 883, 895 (D.C.Cir.1977) (immediate inclusion and deferral to AFDUC are both accepted methods of accounting for plant under construction during start-up period of regulated industry). We find that the Commission's decision to distinguish PUC–LT from PHFU is within its discretion and that it has offered a sufficient rationale for the different treatment it accords them.

Because interest (AFUDC) is accrued on amounts excluded as PUC–LT, the carriers' return on PUC–LT is deferred, not denied. The petitioners object that this treatment of PUC–LT increases the cost of capital in the present, and harms future ratepayers by increasing the rate base they will face when the plant under construction is put into service. The carriers attribute the increase in their present cost of capital to the negative effect that capitalizing financing costs would have upon their "cash flow and coverage ratios," and therefore upon the perceived risk to investors. If the FCC were only to include PUC–LT in the rate

base, but not to allow the carrier to depreciate it before it is put into service, they contend, current ratepayers would pay only the current cost of hiring the capital used to construct the new plant, which would be lower as a result of the reduced risk to investors, while the principal cost of the plant would still be recovered (through the charge for depreciation) from the future ratepayers who have the use of it.

The Commission's approach is not irrational simply because deferring recovery of the cost of capital means that, over the life of the plant, ratepayers will pay more—a very slight percentage more, it appears—than they would if the plant were taken immediately into the rate base (but, as suggested, not depreciated). This effect is inherent in any effort to shift the burden of a present investment to those who will benefit from it in the future; just as not deferring financing costs would lower the present cost of capital a wee bit, not deferring depreciation of the plant would lower the cost of capital still further. The Commission's purpose to protect the interests of ratepayers is not, however, served by single-mindedly lowering the cost of capital; it is also advanced by matching costs to ratepayers with benefits to ratepayers. It is not for the court to decide that present ratepayers should pay for financing future plant so that the overall burden on present and future ratepayers is minimized in present value terms; such inter-temporal distributional decisions are for the agency to make, and so long as it shows that it knows what it is doing, and gives a rational reason for doing it, we will not interfere with the result.

### b. Rate of Interest Used to Calculate AFUDC

As mentioned above, AFUDC is intended to compensate investors for the use of their funds during construction; it is figured on the balance in the PUC–LT account at the compounded prime rate. Upon completion of the plant, the AFUDC is transferred to the rate base along with the cost of the plant, and recovered through the charge for depreciation. *See Reconsideration Order*, 4 FCC Rcd at 1703, ¶ 54.

The Commission's purpose in using the prime rate is to approximate the cost of short-term capital. *See id.* The petitioners object that the Commission's implicit assumptions that prime rate financing is uniformly available to them, and would in fact be used for construction financing, are unreasonable and without foundation; that the use of the prime rate does not fully compensate them for the actual cost of their funds; and that as a result it is confiscatory. The FCC defends its use of the prime rate, but urges *in limine* that the issue is not properly before us in this proceeding.

In the *Notice of Proposed Rulemaking*, with which the Commission initiated the rulemaking now under review, it proposed to continue excluding from the rate base "material and supplies held for construction of new [long-term] plant." 2 FCC Rcd at 333, ¶ 14. In their comments, the petitioners objected to the proposed exclusion, but they did not raise the question of the interest rate, if any, at which material and supply expenses should accrue interest in the event that they continued to be excluded from the rate base.

In the course of deciding the underlying exclusion issue in the *Rate Base Order*, the Commission said:

> When material and supplies are used in long-term construction projects they should be accorded the same [rate base] treatment as the project itself. That is, [they] should be cleared to plant under construction, with AFUDC accrued at the compounded prime rate, until such time as the entire construction project ... is placed in service.

3 FCC Rcd at 274, ¶ 41.

On reconsideration, the petitioners objected for the first time to the Commission's use of the prime rate; they did so, moreover, with respect to AFUDC generally, not just the long-term material and supply component thereof. In response, the Commission adverted briefly to its rationale for adopting the prime rate in 1977, but pointed out that it had not proposed in this proceeding to revisit the question of

the interest rate to be applied to AFUDC, and declined to address the matter on the merits. 4 FCC Rcd at 1703, ¶ 56 (citing *Docket 19129 Order,* 64 F.C.C.2d at 60). In this, the Commission was on solid ground.

If the petitioners want the Commission to reconsider the rationale underlying its use of the prime rate for AFUDC generally, then they must petition the agency to initiate a rulemaking in the usual manner. The petitioners cannot require the Commission to expand the scope of its proceeding through a petition for reconsideration. For the court to countenance the petitioners' attempt to secure review of a policy mentioned only tangentially, in a proceeding that does not comprehend the possibility of changing that policy, would be to join in a procedural entrapment too clever by half. The result would be a novel form of judicial review unbounded by facts or record; indeed there is no record whatsoever in this proceeding on the propriety of the prime rate, and the carriers did not seek before the agency to make one. Obviously, we too must decline to consider the merits of the petitioners' arguments on this subject.

### 2. Non–Cash Working Capital

█ The Commission allows a carrier to include in its rate base the cash it must keep on hand in order to pay expenses. The amount of such "cash working capital" is calculated by netting revenue "leads," or monies received before bills are due, against revenue "lags," or bills that must be paid before the associated revenues are received. The FCC's rationale for including cash items in working capital is that they require the carrier to expend money before receiving the related revenue; that is tantamount to making an investment in the rate base, upon which the carrier is entitled to earn a return. In the *Rate Base Order,* however, the Commission reaffirmed its policy, first adopted in 1977, of excluding "non-cash" items, such as depreciation and deferred taxes, from a carrier's lead-and-lag calculations. (The Commission did not raise this issue in the *Notice of Proposed Rulemaking,* but in response to a suggestion made in comments to the Commission filed by one of the petitioners

now before this court, the agency did address it fully on the merits in both the *Rate Base Order* and the *Reconsideration Order. See* 3 FCC Rcd at 279, ¶ 71; 4 FCC Rcd at 1700, ¶ 28. It does not suggest that the issue is not properly before us for review.)

The petitioners contend that, for the purpose of determining the amount of working capital a carrier needs, non-cash items are indistinguishable from cash items. The Commission reasons that non-cash items should not be included in the calculation of working capital needs on the straightforward ground that they "do not involve cash outlays necessary to pay current day-to-day expenses." *Reconsideration Order,* 4 FCC Rcd at 1699, ¶ 26. Of course, depreciation actually does involve a cash outlay; the outlay merely occurred years earlier when the utility invested in its plant. The revenue lag between recording and actual recovery of depreciation is part of the greater "lag" between investment and recovery of investment. As the carrier is entitled to earn a return on its investment until it is recovered, there is no obvious reason, by ignoring a revenue lag, to cut short the time an investment is included in the rate base.

The FCC's response to the carriers' illustration of this point leaves us with some doubt about whether the Commission understands their objection, and about whether we understand the Commission's reason for rejecting it. The carriers instance

> a $1000 investment with a 4–year life and [a] 45–day lag between when service is rendered and payment is made. [After two years], the rate base [has been depreciated to $500, but the carrier] has collected only $469. Thus, the investor is short $31—he does not earn [a return] on it in the rate base; it has not been returned for reinvestment. As this phenomenon continues over the life of the plant, ratepayers have continuous use of $31 of the investor's money at no cost.

The Commission answers in its brief that the petitioners err:

The rate of return is applied to the average rate base. For example (as the petitioners recognize), at the midpoint of the four-year life of the asset, the rate base entry is $500—not $469 ($500 less the $31 "lag")—and the rate of return applies to that full $500. The investors thus are not deprived of a return on any portion of their investment. (footnote omitted)

If we understand the carriers' point, however, it is that at the midpoint the hypothetical investor, having collected $469, has $531 still invested, even though, just as the FCC says, "the rate base entry is $500 ... and the rate of return applies to that ... $500." So far as we can tell, therefore, the Commission does not disagree with the petitioners that the investor has recouped $469 and is earning a return on $500, yet it draws a diametrically opposing conclusion. Although we cannot say that the carriers are correct, we can at least follow their argument to its conclusion. Unfortunately, this is not the case with regard to the FCC's argument.

The key to our understanding may lie in the Commission's (to us somewhat cryptic) observation, in the *Reconsideration Order*, that the carrier "is not concerned here with a lead or lag related to depreciation expense but instead is concerned about a revenue lag. However, revenue lags are already considered in lead-lag studies regardless of their underlying cost support." 4 FCC Rcd at 1700, ¶ 30. Since the Commission does not marshal this point in its brief, however, we are reluctant to speculate that the quoted passage is the agency's killer response. Our diffidence is the greater because we cannot harmonize the implication of the last-quoted statement— that depreciation-related revenue lags "are already considered in lead-lag studies"— with the FCC's argument that depreciation-related lags need not be included in such studies because they are non-cash items. The former argument would appear to redress, and the latter to reject, the petitioners' charge that there is an unaccounted and uncompensated "lag between recordation and recovery." Accordingly, we remand this issue for the agency's further explication.

3. Telecommunications Plant Adjustment (Account 2005)

The Commission has historically required a carrier that acquires plant from another regulated telecommunications carrier to record that plant at original cost (*i.e.,* the cost to the entity that first put it into regulated service) less accumulated depreciation. *See Rate Base Order*, 3 FCC Rcd at 273, ¶ 36. In the *Reconsideration Order*, the Commission reaffirmed this position, stating that "the acquisition of the property of one utility by another utility presents the possibility for abuse, or at least confuses the question of the proper value to be placed on such property for ratemaking purposes." 4 FCC Rcd at 1704, ¶ 66 (citing *Docket 19129 Reconsideration Order*, 67 F.C.C.2d at 1439). Under the Commission's continuing policy, the difference between the price paid by the acquiring carrier and the net original cost (hereinafter the "premium") is carried in the acquirer's Account 2005, and is presumptively excluded from the rate base. A premium (except one arising from a very small purchase from a non-affiliated entity, *see* 47 C.F.R. § 32.2000(b)(1)), may not be included in the rate base unless the carrier obtains advance confirmation from the FCC, under § 221(a) of the Communications Act, 47 U.S.C. § 221(a), that the acquisition is in the public interest, or the carrier can otherwise "specifically justify the amounts." *Reconsideration Order*, 4 FCC Rcd at 1703, ¶ 58.

■ The petitioners raise two objections. The narrower claim is that, if the purchase from another carrier was approved, under a public interest standard, by a state public service commission (PSC), then the FCC should assume that the purchase price is reasonable for ratemaking purposes. The broader claim is that a purchase from a non-affiliated utility—apparently even if not approved by a PSC—should be presumed to be reasonable. Furthermore, the petitioners say, the Commission's presumptive disallowance of such purchases may

disadvantage ratepayers insofar as it encourages a carrier to build new, fully includable plant rather than to purchase less costly existing plant.

In considering the significance of approval by a state PSC, the Commission noted that it is obliged by statute to ensure that rates are just and reasonable, but stated that it will "give great weight to state approval of property acquisition adjustments." *Id.*, at 1704, ¶ 67. We think that the Commission reasonably refused to treat state approval as dispositive. The potential for unjustified costs is mitigated where a state PSC has approved the transaction in the public interest, but it is not eliminated. It is for the Commission, not us, to determine whether the probability of catching a PSC's oversight is sufficiently high to warrant the FCC's using its own scarce resources, and burdening the carriers and hence ratepayers, in pursuing it.

■ With respect to the petitioners' broad challenge to the requirement that an acquisition price premium be specially justified where buyer and seller are not affiliated, the Commission distinguished between plant purchased with and plant purchased without "traffic", *i.e.*, the right to provide service to customers of the seller who were formerly served by the plant, *id.* at 1709 n. 39. It stated that it would generally require a "higher degree of justification" for purchases of plant with traffic:

[1] When a carrier purchases plant without traffic from another carrier at an equal or lower price than it could obtain the same plant from other sources, both the carrier and the ratepayers stand to benefit from such an acquisition assuming the plant is needed. . . .
[2] However, when the purchase involves plant with traffic, a showing must be made why ratepayers should pay rates based on a higher value for equipment and service that are the same as before the acquisition.

*Id.* at 1705, ¶ 71. The second-quoted sentence applies, in terms and in logic, to plant with traffic acquired from a non-affiliate; it is thus a satisfactory, but only a partial, reply to the petitioners' claim, which also concerns purchases of plant without traffic from a non-affiliate.

The Commission did not further address, however, why it treats plant without traffic acquired from a non-affiliate with the same skepticism that it brings to affiliate transactions and to acquisitions from a non-affiliate of plant with traffic. The first sentence quoted above suggests that the purchase of needed plant without traffic at a competitive price is in the public interest, absent some countervailing danger. Affiliation between buyer and seller clearly represents one such possibility. *See Southwestern Bell Corp. v. FCC*, 896 F.2d 1378, 1380 (D.C.Cir.1990). With respect to non-affiliate transactions, however, the Commission has given no reason for assuming that an acquisition price does not reflect fair value, and for continuing its practice of requiring that "inclusion of [Account 2005] amounts must be determined on a case-by-case basis." *Reconsideration Order*, 4 FCC Rcd at 1704, ¶ 66.

The purchase of plant without traffic from a non-affiliated carrier is not self-evidently distinguishable, in terms of the "possibility of abuse," from the everyday purchase of an input, in the open market, from a non-affiliated non-carrier. Therefore, the Commission should address expressly the petitioners' challenge to its policy of presumptively excluding from the rate base a premium paid in acquiring plant from a non-affiliated carrier. We remand this issue for its further consideration.

4. Special Treatment of Account 2005 for Small Companies

■ The National Telephone Cooperative Association alone seeks review of one aspect of the *Rate Base Order:* the Commission's decision not to adopt special procedures for a small carrier seeking to include an Account 2005 adjustment in its rate base. *See Rate Base Order*, 3 FCC Rcd at 273, ¶ 36. Rather than petitioning for review of that aspect of the Commission's order, however, NTCA sought to intervene in this proceeding, which was initiated by the carriers in order to review

other parts of the Commission's decision. The issue NTCA tries to serve us is, therefore, out of bounds.

An intervening party may join issue only on a matter that has been brought before the court by another party. *See Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498, 64 S.Ct. 731, 735, 88 L.Ed. 883 (1944) ("an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues"); *see also* D.C.Circuit R. 11(e)(2) (brief of intervenor "shall focus on points ... relevant to the issues before this Court"). Otherwise, the time limitations for filing a petition for review and a brief on the merits could easily be circumvented through the device of intervention. *See* Fed.R.App.P. 15(d) ("A motion for leave to intervene ... shall be filed within 30 days of the date on which the petition for review is filed."); D.C.Circuit R. 11(e)(3) (brief of intervenor may be filed up to 15 days after brief of petitioner).

Here, the petitioners have not challenged the small carrier aspect of the FCC's decision. Undaunted by that detail, the NTCA asserts that the issues it presents "are *identical* to those raised by petitioners, *i.e.*, the propriety of the FCC's rate base treatment of plant adjustments." (Emphasis supplied). The intervenor's characterization of the petitioners' challenges operates at an amusingly high level of generality; if such easy manipulation were availing, an intervenor would not, in practice, be limited at all to the issues raised by a petitioner.

By way of illustrating the point, we note that we could grant the NTCA the full relief it seeks while rejecting all of the petitioners' challenges, and vice versa. It is clear, therefore, that the NTCA is asking us to expand this review proceeding by resolving an issue not raised in the petitions for review. We do not, therefore, address the issue raised in its brief.

### III. Conclusion

For the foregoing reasons, we grant the petition for review insofar as it challenges the exclusions from the rate base of non-cash working capital and of the amount paid in excess of net original cost for plant without traffic purchased from a non-affiliate. Those issues we remand for the Commission's reconsideration and further explication in light of this opinion.

*So ordered.*