STATE OF NEW YORK and State
of Florida, Petitioners,

v.

William K. REILLY, Administrator, U.S.
Environmental Protection Agency, and
U.S. Environmental Protection Agency,
Respondents,

Institute of Resource Recovery, Govern-
mental Refuse Collection and Disposal
Association, Inc., Pinellas County,
Florida, National Association of Coun-
ties and the National League of Cities,
Marion County, Oregon, Greater De-
troit Resource Recovery Authority,
United States Conference of Mayors
and the National Resource Recovery
Association, City of Indianapolis, et al.,
Intervenors.

NATURAL RESOURCES DEFENSE
COUNCIL

v.

William K. REILLY, Administrator,
U.S. Environmental Protection
Agency, Respondent,

Institute of Resource Recovery, Govern-
mental Refuse Collection and Disposal
Association, Inc., Pinellas County,
Florida, National Association of Coun-
ties and the National League of Cities,
Marion County, Oregon, Greater De-
troit Resource Recovery Authority,
United States Conference of Mayors
and the National Resource Recovery
Association, City of Indianapolis, et al.,
Intervenors.

Nos. 91–1168, 91–1170.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 6, 1992.

Decided July 14, 1992.

David D. Doniger, Washington, D.C., with whom Robert Abrams, Atty. Gen., State of N.Y., James A. Sevinsky and Joan Leary Matthews, Asst. Attys. Gen., State of N.Y., Albany, N.Y., and Jonathan Glo-gau, Asst. Atty. Gen., State of Fla., Tallahassee, Fla., were on the joint brief, for petitioners, in Nos. 91–1168 and 91–1170.

John P. Dean, with whom Steven M. Oster and Bruce Parker, Washington, D.C., were on the brief, for intervenor Institute of Resource Recovery in Nos. 91–1168 and 91–1170.

Karen L. Egbert, Atty., Dept. of Justice, with whom Barry M. Hartman, Asst. Atty. Gen., Dept. of Justice, Alan Eckett, Associate Gen. Counsel, Michael Winer, Asst. Gen. Counsel, and Robert J. Martineau Jr., Atty., E.P.A., Washington, D.C., were on the brief, for respondents in Nos. 91–1168 and 91–1170. Craig Galli, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.

Scott M. DuBoff, R. Stuart Broom, Washington, D.C., John D. Pirich, Lansing, Mich., Harold Himmelman, David M. Friedland and Barry S. Shanoff, Washington, D.C., were on the brief for intervenors Greater Detroit Resource Recovery Authority, et al., in Nos. 91–1168 and 91–1170.

Frank Shafroth, Denver, Colo., entered an appearance for intervenor National League of Cities in Nos. 91–1168 and 91–1170.

Susan G. Bischoff and Robert C. Cannon, Salem, Or., entered appearances for intervenor Marion County, Oregon in Nos. 91–1168 and 91–1170.

Before SILBERMAN, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Petitioners State of New York and State of Florida (petitioners or petitioner States) challenge the decision of the Environmental Protection Agency (EPA or Agency) to forgo promulgation of two provisions of two proposed rules. The relevant provisions would have required incinerator operators to separate a percentage of certain types of waste from their waste streams before incineration and would have placed

a ban on the incineration of lead-acid vehicle batteries. Because our review of the record demonstrates that EPA adequately supported its decision to drop the waste separation provision, we uphold this portion of the Agency's action. On the other hand, because EPA did not adequately explain why a ban on lead-acid vehicle battery combustion does not represent the best demonstrated technology for reducing harmful incinerator emissions, we remand for further explication of this issue.

## I.

Section 111 of the Clean Air Act, 42 U.S.C. § 7411 (CAA or Act), authorizes EPA to regulate municipal incinerators (municipal waste combustors or MWCs) as sources of air pollution.[1] Pursuant to section 111(b)(1)(B) of the CAA, EPA directly regulates *new* sources of air pollution. Under section 111(d) of the CAA, EPA is required to establish guidelines to be used by the states in regulating *existing* sources of air pollution. Although EPA proposed separate rules to meet the requirements of sections 111(b) and 111(d), the relevant portions of the rules are virtually indistinguishable for our purpose. *See* Proposed Emission Guidelines: Municipal Waste Combustors, 54 Fed.Reg. 52,209, 52,240 (proposed December 20, 1989, under section 111(d)); Proposed Standards of Performance for New Stationary Sources; Municipal Waste Combustors, 54 Fed.Reg. 52,251, 52,281 (proposed December 20, 1989, under section 111(b)).

In general, subsection 111(a) of the CAA requires EPA to set "standards of performance" for sources of air pollution. It provides:

a standard of performance shall reflect the degree of emission limitation ... achievable through application of the best technological system of continuous

emission reduction which (taking into consideration the cost of achieving such emission reduction, any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

42 U.S.C. § 7411(a)(1). EPA has labelled its goal in setting a standard of performance as selection of the "best demonstrated technology" (BDT). *See, e.g.,* 54 Fed.Reg. at 52,253.

EPA's BDT analysis of MWCs resulted in proposed rules which focused primarily on limiting emissions from incinerator smokestacks. At issue in this appeal are three subparts of the proposed rules, viz. 40 C.F.R. § 60.56a(d), 40 C.F.R. § 60.56a(e) and 40 C.F.R. § 60.36a. Proposed rule 40 C.F.R. § 60.56a(d) would have required operators of *new* sources of air pollution to achieve a twenty-five per cent reduction by weight of unprocessed waste by separating out some or all of the following recoverable/recyclable materials: paper and paperboard combined; ferrous materials; nonferrous metals; glass; plastics; household batteries; and yard waste.[2] Proposed rule 40 C.F.R. § 60.56a(e) would have placed a total prohibition on the burning of lead-acid vehicle batteries by *new* sources. Proposed rule 40 C.F.R. § 60.36a would have incorporated the requirements of sections 60.56a(d) and (e) into the guidelines for *existing* sources.

On December 4, 1990, EPA submitted a package of final rules to the Office of Management and Budget (OMB) for review pursuant to Executive Order 12291. OMB did not approve the sections of the proposed rules covering materials separation and battery burning. EPA then appealed to the President's Council on Competitive-

---

1. The Clean Air Act was amended in November 1990, Pub.L. No. 101-549, 104 Stat. 2399. Because the rules involved here were proposed and promulgated before the 1990 amendments took effect, all statutory references are to the 1977 version of the Act.

2. Under the proposed rules an MWC could choose which of the listed materials it wished to

separate from its waste stream without regard to the degree of harmful emissions associated with each of the different types of waste. *See* 54 Fed.Reg. at 52,298-99. The materials separation requirement therefore appears to have been directed more toward encouraging recycling than toward emissions reduction.

ness (Council).[3] In a "Fact Sheet," the Council rejected the proposed rules on materials separation as being inconsistent with "several of the Administration's regulatory principles," (JA 429), including their failure to "meet the benefit/cost requirements for regulatory policy laid out in Executive Order 12291" (JA 430).[4] The Fact Sheet also noted the Council's opinion that the materials separation requirement did not constitute a "performance standard" and that it violated principles of federalism. EPA subsequently abandoned the materials separation and battery burning provisions when it promulgated its final rules. *See* Standards of Performance for New Stationary Sources; Municipal Waste Combustors, 56 Fed.Reg. 5488, 5496 (1991) (to be codified at 40 C.F.R. §§ 51, 52 and 60); Emissions Guidelines; Municipal Waste Combustors, 56 Fed.Reg. 5514, 5521 (1991) (to be codified at 40 C.F.R. § 60).

## II.

### A. *The Separation Requirements*

■ In determining the BDT for limiting harmful emissions, the EPA Administrator must "tak[e] into consideration the cost of achieving such emission reduction, and any nonair quality health and environmental impact and energy requirements." 42 U.S.C. § 7411(a)(1)(C). Because Congress did not assign the specific weight the Administrator should accord each of these factors, the Administrator is free to exercise his discretion in this area. *See Center for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C.Cir.1985). We must therefore uphold EPA's decision to abandon the separation requirements if such action is supported on either air or nonair (including economic) grounds.[5]

Under the CAA, promulgated rules must be accompanied by "an explanation of the reasons for any major changes in the prom-

ulgated rule from the proposed rule." 42 U.S.C. § 7607(d)(6)(A).[6] The Act also requires the court to sustain the Administrator's actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). The petitioners claim that EPA's decision to omit the proposed materials separation requirement from its final rules was arbitrary and capricious because the decision was not supported by substantial evidence, the Agency failed to explain why certain alternatives were not adopted, it improperly based its finding on the "worst case scenario" and it improperly relied on the views of the Council rather than its own expertise. We conclude that EPA's failure to promulgate the materials separation provision survives all of these attacks.

■ The petitioners first claim that EPA's explanations for excluding the materials separation requirement are not adequately supported by the administrative record. We will uphold an agency's conclusions if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *see also Consolidated Oil & Gas, Inc. v. FERC*, 806 F.2d 275, 279 (D.C.Cir.1986). Furthermore, even if the evidence supports both sides of an issue, we will sustain the agency "if a reasonable person could come to either conclusion on that evidence." *Public Citizen Health Research Group v. Tyson*, 796 F.2d 1479, 1485 (D.C.Cir.1986) (citing *Consolo v. Federal Maritime Com.*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)). We are particularly

---

3. The Council was created in 1989. It is chaired by the Vice President and its members include other executive branch officials. Agencies whose regulations have not been approved by OMB may appeal OMB's decision to the Council.

4. The Fact Sheet did not mention the proposed rule prohibiting lead-acid battery combustion.

5. We refer to factors affecting air quality as "air" factors and those affecting economic and other non-air quality concerns as "nonair" factors.

6. The Administrative Procedure Act contains no provision analogous to § 7607(d)(6)(A).

deferential when reviewing agency actions involving policy decisions based on uncertain technical information. *Id.* at 1505 ("[A]s long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence.").

■ The petitioners attack the sufficiency of the evidence supporting EPA's conclusions regarding both air and nonair benefits. On the issue of air-related benefits, EPA's proposed rules noted that, due to the substantial reductions achieved by air pollution control devices, it was unable to reliably quantify the emission reductions attributable to materials separation. 54 Fed.Reg. at 52,240; 54 Fed.Reg. at 52,281. At the time it proposed the rules, however, EPA concluded: "It is simply common sense, and the Agency's expectation, that reductions in the amount of pollution-generating materials combusted in an MWC will reduce the amount of pollutants in its air emissions." 54 Fed.Reg. at 52,240; 54 Fed.Reg. at 52,281. When it omitted the separation requirements from its final rules, EPA concluded that emissions reductions resulting from materials separation were not only difficult to quantify but were in fact relatively small. 56 Fed.Reg. 5488, 5496 (1991) (to be codified at 40 C.F.R. §§ 51, 52 and 60); 56 Fed.Reg. 5514, 5521 (1991) (to be codified at 40 C.F.R. § 60). This conclusion has adequate support in the record. *See* Emission Standards Division, Division of the Office of Air Quality Planning and Standards, U.S. Envtl. Protection Agency, Pub. No. EPA–450/3–90–021, Municipal Waste Combustion: Background Information for Materials Separation 5–15 to 5–16 (1991) (describing tests examining emissions from unseparated versus separated waste and concluding that efficacy of existing antipollution devices results in small emissions reduction from waste separation).

The petitioners next challenge whether EPA's conclusions regarding nonair benefits are adequately supported in the record. Both the proposed rules and the final rules note that requiring separation and recycling could lead to either a cost benefit or a cost detriment. *See* 54 Fed.Reg. at 52,242; 54 Fed.Reg. at 52,283–84; 56 Fed.Reg. at 5497. While EPA *initially* forecast a likely benefit, 54 Fed.Reg. at 52,243, in promulgating its final rules it determined that the record was too inconclusive to justify a materials separation rule, 56 Fed.Reg. at 5497. We must therefore determine whether EPA adequately supported its change in position. The preamble to the final rules recites that the Agency, based in part on its own analysis, agreed with those comments suggesting that the uncertainty over costs associated with separation and recycling might be even greater than EPA had originally believed. *See, e.g.,* Comments of The U.S. Conference of Mayors National Resource Recovery Association, JA 342 ("We estimate that, depending on the technology/program mix, total program costs are likely to range from $100 to more than $200 per ton of recycled product, including collecting, processing, and marketing the material"). We conclude that these comments, on which the Agency expressly relied to confirm its own views on cost uncertainty, *see* 56 Fed.Reg. at 5497, provide sufficient evidence to support its changed view.[7]

7. After issuing its proposed rules, EPA conducted two studies on the economic effect of materials separation. These studies produced varying estimates regarding the effect of separation on costs. EPA stated that it did not rely on these studies in promulgating its final rules because the studies were not available for public inspection during the comment period. 55 Fed.Reg. at 5497. But EPA specifically mentioned these studies in responding to comments on the materials separation issue. *See* Emission Standards Division, Division of the Office of Air Quality Planning and Standards, U.S. Envtl. Protection Agency, Pub. No. EPA–450/3–91–004, *Municipal Waste Combustion: Background Information for Promulgated Standards and Guidelines—Summary of Public Comments and Responses* 4–52 to 4–53 (1990). EPA also used the studies in its brief. *See* EPA Brief at 25 & n. 8. As we noted, however, the final rules expressly rely on the comments and other analyses rather than the additional studies. *See* 56 Fed.Reg. at 5497 (citing document II–B–047 in docket A–89–09). EPA's references to the post-proposal studies, therefore, do not alter our conclusion that EPA's decision to omit the materials separation provision was supported by substantial evidence.

■ The petitioners next claim that EPA arbitrarily and capriciously deleted the materials separation requirement because of its uncertainty whether sales of recycled materials would compensate for separation costs. The petitioners claim that any economic losses could be avoided by issuing a "combustion permit" which would serve as a waiver of the separation requirement if an incinerator operator could not find a recycling market for its recovered materials. *See* 54 Fed.Reg. at 52,245; 54 Fed. Reg. at 52,286–87. As set forth in the proposed rules, if after 120 days an incinerator operator could not sell its separated materials, it could then obtain a combustion permit to burn them. 54 Fed.Reg. at 52,-245; 54 Fed.Reg. at 52,286–87. Combustion permits were omitted from the rules along with the separation requirements.

We do not find the petitioners' combustion permit rationale persuasive. According to the proposed rules, combustion permits were designed to encourage combustion rather than landfilling where recycling would not be feasible. *See* 54 Fed.Reg. at 42,245; 54 Fed.Reg. at 52,286. In fact, as originally proposed, combustion permits would not have insured cost benefits because incinerator operators would have been required to continue separating waste even while operating under a permit. 54 Fed.Reg. at 42,245; 54 Fed.Reg. at 52,286. Because, under the proposed rules, combustion permits would not have solved the problems that led EPA to change its position, and because no genuine cost saving alternative to the proposed combustion permit was offered by commenters during the rule making proceedings, EPA was not obliged to address the combustion permit issue in its final rules.[8]

■ The petitioners further claim that EPA improperly relied solely on the "worst case scenario" in arriving at its final conclusion regarding the economics of materials separation. Our review of the record demonstrates that several commenters supported EPA's economic predictions. *See* Summary of Public Comments and Responses, *supra*, at 4–55 to 4–56. Moreover, even if EPA's prediction did take into account the worst case scenario, its action would be permissible. This court has held that in applying a uniform standard to an industry, the standard must "be capable of being met under most adverse conditions which can reasonably be expected to recur." *National Lime Ass'n v. EPA*, 627 F.2d 416, 431 n. 46 (D.C.Cir.1980).

■ Lastly, the petitioners claim that EPA acted improperly in relying on the opinion of the Council rather than exercising its own expertise. *See Tyson*, 796 F.2d at 1505 ("[W]e cannot defer when the agency simply has not exercised its expertise."). After reviewing the record, we conclude that EPA did exercise its expertise in this case. The procedural history of the rules at issue demonstrates that the Council's views were important in formulating EPA's final policy decision regarding materials separation. The fact that EPA reevaluated its conclusions in light of the Council's advice, however, does not mean that EPA failed to exercise its own expertise in promulgating the final rules.[9]

In sum, EPA's change of position on the materials separation issue was not improper. We are extremely deferential to administrative agencies in cases involving technical rulemaking decisions, *see Tyson*, 796 F.2d at 1505, and EPA has supported its new view of the materials separation policy

8. The proposed rules solicited comments on "whether, under certain circumstances, the requirement to separate materials for which a combustion permit has been granted ... should be dropped." 54 Fed.Reg. at 52,246; 54 Fed. Reg. at 52,287. The petitioners point to no comments received in response to the solicitation.

9. The petitioners also challenge some of the Council's comments. First, they challenge the Council's conclusion that the separation plan

would violate principles of federalism because waste management is traditionally a state and local concern. Second, they challenge the Council's contention that the separation requirement is not a "standard of performance" because it sets a strict standard rather than allowing flexibility in meeting a particular goal. We do not address the merits of either of these arguments as neither appears to have been a decisive factor in EPA's decision to omit the materials separation requirement.

with adequate evidence. Because the CAA allows EPA to balance air and nonair benefits and costs, which it did, EPA's decision not to promulgate materials separation rules was neither arbitrary nor capricious.[10]

### B. *The Battery Burning Prohibition*

■ Despite its continued belief that "lead acid batteries are certainly a significant source of lead in MWC emissions," 56 Fed.Reg. at 5499, EPA decided not to include a ban on the burning of lead-acid vehicle batteries in its final rules, *id.;* 56 Fed.Reg. at 5521. The Agency offered three reasons for its decision to omit the ban: (1) commenters questioned whether it would be possible to achieve 100 per cent compliance; (2) the Resource Conservation and Recovery Act includes strict provisions against the burning of lead-acid batteries; and (3) EPA is considering a comprehensive approach to recycling lead-acid batteries under section 6 of the Toxic Substances Control Act. 56 Fed.Reg. at 5499. Because EPA's proffered reasons for omitting the battery ban do not adequately explain why the ban is not the BDT in this area, this portion of the proposed rules, 40 C.F.R. §§ 60.56a(e) and 60.36a (to the extent that it imposes a ban on burning lead-acid vehicle batteries), is remanded to the Agency for more reasoned decisionmaking.

The petitioners countered EPA's first rationale by suggesting that, if 100 per cent compliance with a ban on burning lead-acid batteries is impossible, EPA could have adopted some lesser restriction (e.g. a 99 or 95 per cent ban). EPA responded by stating that it was limited to a choice between a 100 per cent ban or no ban at all. *See* EPA Br. at 40. We disagree with EPA's position. We have held that EPA has the authority to deviate from a proposed rule as long as its final rule represents a "logical outgrowth" of the proposal. *See Small*

*Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983); *United Steelworkers of Am. v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). EPA cannot claim to have been unaware of the possibility of a less restrictive rule as at least one commenter suggested a "best efforts" or "reasonable efforts" standard. *See* Summary of Public Comments and Responses, *supra,* at 4–86.

EPA's next two rationales simply recognize that the matter of lead-acid battery incineration can be addressed under other statutes. Because EPA originally proposed the ban as the BDT for reducing emissions from batteries, and the CAA requires the Agency to explain why it changed its mind on this point, the mere existence of other statutory authority which might undergird EPA's final stance is insufficient to justify the omission of the battery ban. EPA has admitted that a ban would achieve air benefits. *See* 56 Fed. Reg. at 5499. The final rules, however, do not discuss nonair benefits or other economic benefits which would justify omitting the provision despite the air benefits. We therefore conclude that the rules must be remanded to EPA to explain why the BDT for reducing emissions resulting from lead-acid vehicle batteries is not a total or limited ban on their combustion.

### III.

Because EPA did not adequately explain its reasons for not imposing a ban of some degree on the burning of lead-acid vehicle batteries, we remand the rules to the Agency. We uphold EPA's decision not to promulgate blanket materials separation rules, however, because the Agency adequately articulated and supported its

---

10. We note that EPA has stated that it may impose separation requirements during individual permit proceedings as part of its "Best Available Control Technology" (BACT) determinations under section 169(3) of the CAA. 56 Fed. Reg. at 5496 n. 4. The Agency also plans to address waste recycling further under the provisions of the Resource Conservation and Recovery Act (RCRA). *See* 56 Fed.Reg. at 5497. Thus, although it has decided against promulgating a general rule on materials separation, EPA has reserved the right to require recycling and separation in those cases it believes suited to such a program.

change in position.[11]

The petitions for review are therefore granted in part and denied in part.

*So ordered.*

---

**11.** Intervenor Institute of Resource Recovery (IRR) claims that EPA does not have the authority to promulgate these rules at all. In general, "[a]n intervening party may join issue only on a matter that has been brought before the court by another party." *Illinois Bell Tel. Co. v. FCC,* 911 F.2d 776, 786 (D.C.Cir.1990) (citing *Vinson v. Washington Gas Light Co.,* 321 U.S. 489, 498, 64 S.Ct. 731, 735, 88 L.Ed. 883 (1944)). Neither the petitioners nor the respondent has suggested that EPA lacks the authority to promulgate materials separation rules. Although we have held that the *Illinois Bell* requirement is a prudential matter, *Synovus Fin. Corp. v. Board of Governors,* 952 F.2d 426, 434 (D.C.Cir.1991), we waive the *Illinois Bell* requirement only in "extraordinary cases." *Lamprecht v. FCC,* 958 F.2d 382, 389 (D.C.Cir.1992); *see also Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 962 F.2d 27, 37 n. 4 (D.C.Cir.1992). This is not an extraordinary case. The intervenor has not been aggrieved and the Agency has not expressed its opinion on the question. *Cf. Synovus,* 952 F.2d at 432–33.