**1254**

ILLINOIS BELL TELEPHONE COMPANY, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone Company, The Ohio Bell Telephone Company, and Wisconsin Bell, Inc., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

BellSouth Corporation, Southern Bell Telephone and Telegraph Company and South Central Bell Telephone Company, Consumer Federation of America, The International Communications Association and MCI Telecommunications Corporation, New York Telephone Company and New England Telephone and Telegraph Company (NYNEX), United States Telephone Association, American Telephone and Telegraph Company, National Telephone Cooperative Association, Pennsylvania Office of Consumer Advocate, GTE Service Corporation and GTE Telephone Operating Companies, Indiana Office of Utility Consumer Counselor, Southwestern Bell Telephone Company, Bell Atlantic Telephone Companies, U S WEST Communications, Inc., The Ad Hoc Telecommunications Users Committee, Rochester Telephone Corporation, The Organization for the Protection and Advancement of Small Telephone Companies, Maryland People's Counsel, Intervenors.

BELLSOUTH CORPORATION, Southern Bell Telephone and Telegraph Company and South Central Bell Telephone Company, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

New York Telephone Company and New England Telephone and Telegraph Company (NYNEX), et al., Intervenors.

ILLINOIS BELL TELEPHONE COMPANY, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone Company, The Ohio Bell Telephone Company, and Wisconsin Bell, Inc., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Telephone and Telegraph Company, GTE Service Corporation and the GTE Telephone Operating Companies, et al., Intervenors.

ILLINOIS BELL TELEPHONE COMPANY, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone Company, The Ohio Bell Telephone Company and Wisconsin Bell, Inc., BellSouth Corporation, South Central Bell Telephone Company and Southern Bell Telephone and Telegraph Company, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Telephone and Telegraph Company, Southwestern Bell Telephone Company, et al., Intervenors.

Nos. 91–1020, 91–1041, 91–1064 and 91–1581.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1993.

Decided April 2, 1993.

1256

Petitions for Review of Orders of the Federal Communications Commission.

Alfred W. Whittaker argued the cause, for petitioners Illinois Bell Telephone Co., Indiana Bell Telephone Co., Inc., Michigan Bell Telephone Co., The Ohio Bell Telephone Co., and Wisconsin Bell, Inc. With him on the briefs were John G. Mullan, Floyd S. Keene, and Michael S. Pabian.

M. Robert Sutherland argued the cause, for petitioners BellSouth Corp., Southern Bell Telephone and Telegraph Co. and South Central Bell Telephone Co. With him on the briefs was William B. Barfield.

Laurence N. Bourne, Counsel, F.C.C., argued the cause, for respondents. With him on the brief were Renee Licht, Acting General Counsel, and John E. Ingle, Deputy Associate General Counsel, F.C.C., and Robert B. Nicholson and Robert J. Wiggers, Attorneys, Department of Justice.

Frank W. Krogh argued the cause, for intervenors Consumer Federation of America, Indiana Office of Utility Consumer Counselor, Maryland People's Counsel, Pennsylvania Office of Consumer Advocate, International Communications Ass'n, and MCI Telecommunications Corp. With him on the joint brief were Gene Kimmelman, Robert K. Johnson, John M. Glynn, Gary L. Lieber, Robert L. Duston, Philip F. McClelland, Denise C. Goulet, Brian R. Moir, and Donald J. Elardo.

Robert B. McKenna, Durward D. Dupre, Richard C. Hartgrove, and Thomas A. Pajda were on the joint brief, for intervenors U S WEST Communications, Inc., and Southwestern Bell Telephone Co.

William B. Barfield and R. Frost Branon, Jr. entered appearances, for intervenors BellSouth Corp., Southern Bell Telephone and Telegraph Co. and South Central Bell Telephone Co.

Saul Fisher, Mary McDermott, and Donald W. Boecke entered appearances, for intervenors New York Telephone Co. and New England Telephone and Telegraph Co.

Martin T. McCue entered an appearance, for intervenor U.S. Telephone Ass'n.

Francine J. Berry, Jules M. Perlberg, and C. John Buresh, for intervenor American Telephone and Telegraph Co.

David Cosson entered an appearance, for intervenor National Telephone Cooperative Ass'n.

Gail L. Polivy and Richard McKenna entered appearances, for intervenors GTE Service Corp. and GTE Telephone Operating Companies.

Richard C. Hartgrove, Durward D. Dupre, and Thomas A. Pajda entered appearances, for intervenor Southwestern Bell Telephone Co.

Thomas L. Welch and Mark J. Mathis entered appearances, for intervenor Bell Atlantic.

James S. Blaszak and Charles C. Hunter entered appearances, for intervenor Ad Hoc Telecommunications Users Committee.

Lisa M. Zaina entered an appearance, for intervenor The Organization for the Protection and Advancement of Small Telephone Companies.

Alfred W. Whittaker, John G. Mullen, Floyd S. Keene, and Michael S. Pabian entered appearances, for intervenors Illinois Bell Telephone Co., Indiana Bell Telephone Co., Inc., Michigan Bell Telephone Co., The Ohio Bell Telephone Co., and Wisconsin Bell, Inc.

Thomas J. Casey and Jay L. Birnbaum entered appearances, for intervenor Central Telephone Co.

John Thorne, Michael D. Lowe, and J. Manning Lee entered appearances, for intervenor Bell Atlantic Telephone Companies.

Before: MIKVA, Chief Judge, BUCKLEY and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

In 1984, in compliance with a consent decree, American Telephone and Telegraph Company divested itself of the twenty-two companies in the Bell System providing local telephone, or local exchange, service. *United States v. Western Elec. Co.*, 797 F.2d 1082, 1084 (D.C.Cir.1986); *see generally United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd mem. sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Thereafter, these regional Bell operating companies, or "BOCs," were to engage in two major activities: providing telephone service among parties within each local exchange and granting access to the exchanges to long-distance carriers. *American Tel. & Tel.*, 552 F.Supp. at 141; M. KELLOGG ET AL., FEDERAL TELECOMMUNICATIONS LAW § 4.8, at 227 (1992). The consent decree also led to the creation of seven Regional Holding Companies (RHCs), each of which wholly owned and operated a set of BOCs. *Western Elec.*, 797 F.2d at 1084.

Revisions to the original AT & T consent decree have permitted the RHCs to enter into non-telecommunications ventures and to provide exchange services outside their respective geographic regions, the latter an option that has led to the RHCs' becoming significant participants in the paging and cellular telephone markets. *Western Elec.*, 797 F.2d at 1091; *United States v. Western Elec. Co.*, 673 F.Supp. 525, 599 (D.D.C. 1987); KELLOGG ET AL., *supra*, § 13.4, at 668–71. The financial performance of RHCs is thus no longer completely tied to the performance of the BOCs each RHC controls.

With respect to the BOCs, the FCC regulates the charges BOCs may impose on interstate carriers who use BOC equipment to connect with customers in the local telephone system. *See MTS & WATS Market Structure*, 93 F.C.C.2d 241, 245–46, ¶¶ 9–10 (1983). The FCC controls the total charges for these interstate access services by, among other things, specifying what investments will be included in telephone company rate bases and what investments will be excluded, and by determining the rate of return permitted on the investments included in the rate bases for such services.

After the breakup of AT & T, the FCC revised its rules for calculating the rate base for interstate services. *Amendment of Part 65 of the Commission's Rules to Prescribe Components of the Rate Base and Net Income of Dominant Carriers*, 3 F.C.C.R. 269 (1987) ("*1987 Rate Base Prescription*"), *on reconsideration*, 4 F.C.C.R. 1697 (1989) ("*1989 Rate Base Reconsideration*") (collectively, the "*Rate Base Order*"). A group of telephone companies challenged the resulting *Rate Base Order* in this court. *Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776 (D.C.Cir.1990). The companies claimed that the *Rate Base Or-*

*der,* which employed a "used and useful" test to determine whether a company could include an asset in the rate base, was confiscatory in violation of the Fifth Amendment to the Constitution. *Id.* at 779. We held that such a claim was not ripe without an FCC determination of the allowable rate of return on the "used and useful" rate base; only when "viewed in tandem" could it be decided if the net result was unconstitutional. *Id.* at 780. We also remanded to the FCC for further explanation its treatment of non-cash working capital items and the costs of telecommunications plant. *Id.* at 783–85.

The FCC later issued a final order addressing the rate of return on interstate telephone services. *Represcribing the Authorized Rate of Return for Interstate Services of Local Exchange Carriers,* 5 F.C.C.R. 7507 (1990) ("*1990 Rate Represcription*"), *on reconsideration,* 6 F.C.C.R. 7193 (1991) ("*1991 Rate Reconsideration*") (collectively, the "*Rate of Return Order*").

BellSouth[1] and Ameritech[2] separately petitioned this court for review of the *Rate of Return Order.* Because its claim that the FCC rate base rules are confiscatory became ripe when the FCC issued the *Rate of Return Order,* Ameritech also renewed its petition for review of the *Rate Base Order.*[3]

While the FCC was reconsidering its rate of return order, it issued its order addressing the remanded rate base issues. *Amendment of Part 65 of the Commission's Rules to Prescribe Components of the Rate Base and Net Income of Dominant Carriers,* 7 F.C.C.R. 296 (1991) ("*1991 Rate Base Remand Order*"). Both Ameritech and BellSouth petitioned this court for review of this *1991 Rate Base Remand Order.*[4] We granted motions to consolidate the petitions.

I

The FCC determines the permissible revenue requirements of BOCs by first estimating operating costs including taxes. To this figure the agency adds an estimate of the cost of financing necessary investment in plant and equipment, *i.e.,* the cost of capital. The FCC estimates this figure by calculating a rate base and multiplying the rate base by a rate of return. The mathematical representation is $I \times r + C = R,$ where $I$ is the rate base, $r$ is the rate of return, $C$ is operating costs, and $R$ is the total revenue requirement. *See Illinois Bell Tel.,* 911 F.2d at 778–79; S. BREYER & R. STEWART, ADMINISTRATIVE LAW AND REGULATORY POLICY: PROBLEMS, TEXT AND CASES 223–24 (2d ed. 1985); *cf.* 47 C.F.R. § 69.2(c), (o), (z) & (ff). The FCC derives $I$ from the cost to acquire "used and useful" equipment and other assets, less any deprecia-

---

**1.** The BellSouth petitioners were BellSouth Company (the RHC), South Central Bell Telephone Company and Southern Bell Telephone and Telegraph Company. On January 1, 1992, South Central and Southern Bell merged and became BellSouth Telecommunications, Inc.

**2.** The operating companies of Ameritech (the RHC) jointly filed this and other petitions. The individual companies are Illinois Bell Telephone Company; Indiana Bell Telephone Company, Inc.; Michigan Bell Telephone Company; The Ohio Bell Telephone Company; and Wisconsin Bell, Inc.

**3.** The FCC moved to dismiss this petition, arguing that it was untimely because Ameritech filed the petition nearly two years after the *Rate Base Order* issued. While the law requires parties to file petitions within 60 days of entry of an order (28 U.S.C. § 2344), we have recognized an exception when the underlying claim had previ-

ously been unripe. *Raton Gas Transmission Co. v. FERC,* 852 F.2d 612, 615 (D.C.Cir.1988). This court declared unripe Ameritech's original and timely filed petition for review of the *Rate Base Order. Illinois Bell Tel.,* 911 F.2d at 779–80. Upon the promulgation of the *Rate of Return Order* the constitutional claim matured, and Ameritech filed a new petition. Under these circumstances, we hold that Ameritech's petition was timely filed. *See Baltimore Gas & Elec. Co. v. ICC,* 672 F.2d 146, 149–50 (D.C.Cir.1982).

**4.** Consumer advocacy groups and other telephone companies intervened in the proceedings, and two groups of intervenors have submitted briefs in the consolidated cases. Intervenors Southwestern Bell Telephone Company and U S WEST Communications, Inc. weigh in on the side of BellSouth. Intervenors International Communications Association, Maryland People's Counsel, MCI Telecommunications Corporation, and the Pennsylvania Office of Consumer Advocate are in the FCC's corner.

tion the company has recognized.[5] *See* 47 C.F.R. §§ 65.800–65.830. The FCC's original cost rate base is a rough approximation of book equity. Book equity, like the original cost rate base, is generally based on historical costs. *See* G. JOHNSON & J. GENTRY, JR., FINNEY & MILLER'S PRINCIPLES OF ACCOUNTING 32, 367–68 (8th ed. 1980).

The rate of return, *r*, or cost of capital, is the weighted average of the company's cost of debt financing and its cost of equity financing. *See* 47 C.F.R. § 65.304(c) & (d). The terms of the paper generally determine the rate of return on debt. *See* 47 C.F.R. § 65.301. The cost of equity capital is determined differently. In this case the FCC, in an effort to ensure that resulting rates would be "just and reasonable," 47 U.S.C. §§ 201(b), 205(a), reviewed an array of methods for estimating the appropriate rate of return, including historical discounted cash flow (DCF), classic DCF, state cost of capital determinations, Standard & Poors (S & P) 400 benchmarks, risk premium analysis, and comparable firms analyses. *1990 Rate Represcription*, 5 F.C.C.R. at 7512–16, ¶¶ 46–75 & 7521–27, ¶¶ 121–73. After considering the arguments for and against each methodology, the FCC gave the "greatest weight" to the classic DCF estimate (which we shall describe in a moment). *Id.* at 7529, ¶ 187. The FCC decided that the reasonable range of the cost of equity was 12.5% to 13.5%. *Id.* at 7529, ¶ 188. Petitioners challenge this finding as arbitrary and capricious, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). Ameritech also claims the FCC orders are confiscatory, in violation of the Fifth Amendment.

A

Ameritech concentrates on the *Rate of Return Order's* cost of equity capital. The attack is waged on two fronts: the methodology the FCC employed and the data upon which the FCC relied. Ameritech's methodological complaint is that the FCC cannot consistently use the classic DCF formula to calculate the rate of return and then apply it to an historical cost rate base.

The FCC relied on "classic" DCF methodology, which assumes that the price of a share of stock is equal to the present value of the cash flows the stock will generate. J. BONBRIGHT ET AL., PRINCIPLES OF PUBLIC UTILITY RATES 318 (2d ed. 1988).[6] These cash flows are in the form of dividends.[7] Because a dollar available now is worth more than a dollar available only later, the future cash flows must be reduced by a rate that reflects investors' opportunity costs, *i.e.*, their required rate of return or discount rate. *Id.* Assuming that this discount rate and the growth rate of dividends both remain constant, one calculates the price of the stock using the following formula: $P = D/(r-g)$, where $P$ is the current price of the stock, $D$ is the total dividend in the first year, $r$ is the rate of return, and $g$ is the expected annual growth of dividends. *Id.; see also* A. KOLBE ET AL., THE COST OF CAPITAL: ESTIMATING THE RATE OF RETURN FOR PUBLIC UTILITIES 53–54 (1984). Since regulatory commissions are interested in the rate of return, they rearrange the equation to solve for $r$: $r = D/P + g$.

This is the formula the FCC used to develop its rate of return estimate. Basing its calculations on data for the seven RHCs (*1990 Rate Represcription*, 5 F.C.C.R. at 7528–29, ¶¶ 187–88), the FCC employed a

---

**5.** Since depreciation is an operating cost, investors recover such amounts dollar for dollar. *See* BREYER & STEWART, *supra* p. 1258, at 237 n. 59.

**6.** The DCF method "has become the most popular technique of estimating the cost of equity, and it is generally accepted by most commissions. Virtually all cost of capital witnesses use this method, and most of them consider it their primary technique." *Id.* at 317–18.

**7.** Cash flows also result from the ultimate sale of the stock. R. BREALEY & S. MYERS, PRINCIPLES OF

CORPORATE FINANCE 49 (4th ed. 1991). However, the theory is that the next investor will be willing to buy the stock at a price based on his estimate of future dividends and the price at which he will be able to sell; so too the third investor and the fourth, *ad infinitum.* The most basic form of the DCF model therefore assumes that the stock is held forever. BONBRIGHT ET AL., *supra* at 318. For a detailed explanation, together with the mathematics, *see* 1 A. KAHN, THE ECONOMICS OF REGULATION: PRINCIPLES AND INSTITUTIONS 58–60 (1988).

"classic" version of the DCF, using relatively current rather than historical stock price data. *Compare id.* at 7512, ¶¶ 46–48 *with id.* at 7514, ¶¶ 61–63. To project the long-term growth rate, the FCC relied on a compilation of analysts' estimates published by the Institutional Brokers Estimate Service (IBES). *Id.* at 7515, ¶¶ 67–69. The FCC derived the upcoming year's dividend by increasing each RHC's current annualized dividend by one-half the IBES growth rate, thereby accounting for the average expected increase in dividends. *Id.* at 7514, ¶¶ 64–66. Using these figures, the FCC estimated the cost of capital of the RHCs. The average rate ranged from 11.71% in January 1990 to 12.60% in July, six months later. *Id.* at 7511, ¶ 39. After considering the possible influence of other factors, the FCC decided that the range of reasonable estimates of the interstate access service cost of equity was 12.5% to 13.5%. *Id.* at 7528–29, ¶¶ 179–88. This range for the cost of equity, weighted with the cost of debt, produced a "zone of reasonableness" for the overall cost of capital of 10.85% to 11.4%. *Id.* at 7529, ¶ 189. From within this zone the FCC selected a rate of return in the upper end, 11.25%. *Id.* at 7532, ¶ 216. The FCC applied this total rate of return to the original cost rate base. Ameritech's contention is that just as "the combination of FERC's rate base and rate of return methodologies [did] not produce an acceptable 'end result' " in *Farmers Union Cent. Exchange, Inc. v. FERC*, 734 F.2d 1486, 1527 (D.C.Cir.1984), so too the combination of the FCC's original cost rate base and a rate of return derived from current market values is unacceptable.

■ The ultimate measure of the reasonableness of the combination of methodologies is, of course, the "end result." *Farmers Union*, 734 F.2d at 1527; *see FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942). As did the petitioners in *Farmers Union*, Ameritech challenges the FCC's general methodology, not a specific set of rates. 734 F.2d at 1490. An agency blend of

ratemaking methods so challenged is arbitrary and capricious if the expected results are so. FERC's methodology, reviewed in *Farmers Union*, ensured " 'creamy returns on book equity,' " *id.* at 1497, and therefore was not "just and reasonable" to *consumers.* We evaluate the FCC methodology to see that it is "just and reasonable" to *investors.* 47 U.S.C. §§ 201(b), 205(a).

■ "By long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense." *Natural Gas Pipeline*, 315 U.S. at 585, 62 S.Ct. at 743; *see Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310, 109 S.Ct. 609, 617, 102 L.Ed.2d 646 (1989); *Permian Basin Area Rate Cases*, 390 U.S. 747, 770, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1968); *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1175 (D.C.Cir.1987); *cf. American Tel. & Tel. Co. v. FCC*, 836 F.2d 1386, 1391–92 (D.C.Cir.1988). The Supreme Court has stated that a just and reasonable rate should be "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital"; the rate should also be "commensurate with returns on investments in other enterprises having corresponding risks." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) (*"Hope"*). Because the critical determination in both matters is essentially the same, we consider together the Commission's rulings on Ameritech's "arbitrary and capricious" challenge and its closely-related constitutional claims.

The gist of Ameritech's objection is that the FCC approach does not adequately compensate investors when their shares are trading above book values, that is, when the market-to-book ratio exceeds one. The RHCs all recently have traded at market-to-book ratios in excess of one.[8] If the returns the FCC permits are too low, so the argument goes, the market price of the

---

8. During the late 1970s and early 1980s, the ratio for Bell system companies was below one. W. Whittaker, *The Discounted Cash Flow Meth-* *odology: Its Use in Estimating a Utility's Cost of Equity*, 12 Energy L.J. 265, 267 (1991).

stock will fall. This decline will harm current investors and deter future ones, thereby inhibiting the RHCs' ability to "attract capital," one of the *Hope* tests. In response, the FCC states that it has no obligation "to ensure a particular market to book ratio." *1990 Rate Represcription,* 5 F.C.C.R. at 7520, ¶ 115. Ameritech bears the "heavy burden of making a convincing showing that [the FCC's policy] is invalid because it is unjust and unreasonable in its consequences." *Hope,* 320 U.S. at 602, 64 S.Ct. at 288.

The record shows, according to Ameritech, that the FCC's combination of methodologies will cause a precipitous drop in share values. As evidence Ameritech cites the testimony of Dr. Charles F. Phillips, Jr. Dr. Phillips stated that if the RHC stocks traded at book value, the loss to current shareholders would be approximately *78 billion dollars.* The FCC has adequately explained why Dr. Phillips' testimony, though dramatic, is not persuasive. The *Rate of Return Order* affects only the revenues from interstate access to local exchanges. The RHCs also earn revenues from other regulated telephone services, cellular phone operations, and unregulated investments. *See 1990 Rate Represcription,* 5 F.C.C.R. at 7517, ¶¶ 83, 89. RHC stockholders own a proportionate share of all of these activities. Appreciations in the value of unregulated industry assets or excessive returns on regulated activities could account for the current market-to-book ratios.[9] *Id.* at 7520, ¶ 115. If these other factors are responsible for market prices in excess of book values, then current investors will not be harmed by the FCC's new rates in the way Ameritech claims. The actual reaction of the market to the FCC's announcement of the new 11.25% rate of return is not part of the record. Yet, because such information would have become available only after the Commission promulgated the *1990 Rate Represcription* order, Ameritech had a statutory right to submit evidence of any steep decline in share prices. *See* 47 U.S.C. § 405(a). It apparently did not do so. Silence may sometimes be deafening.

The FCC detected in Ameritech's argument an attempt to revive the old "fair value" ratemaking principle. *1990 Rate Represcription,* 5 F.C.C.R. at 7521, ¶ 117; *see Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). Ameritech asserts that it does not seek a return to mandatory "fair value" ratemaking. Ameritech Reply Brief at 4. Yet Ameritech's criticism of the application of DCF to an original cost rate base is fundamentally that the resulting revenue fails properly to compensate investors who purchase shares at current trading prices.[10] *See* Ameritech Brief at 24–26, 29–30. Ameritech's objection is essentially that the FCC methodology does not preserve this "fair value" price. We see little difference between sustaining an objection that a methodology does not preserve fair value and requiring

---

**9.** If the regulatory agency allows a company to earn more than the required cost of capital, theory has it that market-to-book ratios will exceed one, *ceteris paribus.* 1 KAHN, *supra* note 7, at 48 n. 69, 50. If the cause of the current market-to-book ratios is in fact an excessive rate of return on interstate access service (instead of other regulated activities), Ameritech can hardly complain about the reduction in the rate.

**10.** This is evident from Ameritech's numerical example in its brief. Ameritech Brief at 11–12, 24–25. Ameritech assumes a rate base of $40, while $D = \$3$, $g = 5\%$, and $r = 10\%$; thus $P = \$60$. $(60 = 3/(.10 - .05))$. Ameritech complains that applying a 10% rate of return to a $40 rate base means that investors will only get $4 for their $60 investment, a 6.67% return, which is too low. But if the market price of the stock adjusts to $40, the return will become 10%, so this argument simply recapitulates the claim we reject: that current market values must be preserved.

Ameritech's example also suffers from circularities: Ameritech assumes a rate of return to calculate a price, and then uses that price to suggest a proper rate of return. Similarly, the dividend and growth rate are functions of the rate of return the Commission allows; to assume these figures is implicitly to assume the rate of return. While this problem of circularity reflects a general problem in application of the DCF model to regulated industries, in practice the problem is "unlikely to be serious" because of changes in the market price of the stock and the resulting impact on the effective dividend rate, as well as agency efforts to use evidence from a broad sample of companies. KOLBE ET AL., *supra* p. 1259, at 59–60.

the FCC to uphold fair value in the first place. The Supreme Court has made clear that the FCC has no obligation to maintain the current market value of investors' property. *See Hope,* 320 U.S. at 601, 64 S.Ct. at 287; *see also Jersey Cent. Power & Light,* 810 F.2d at 1175. That doctrine supports the FCC's decision to establish a rate of return that may not compensate shareholders in such a way that share prices will remain at the same level, *ceteris paribus.*

The FCC was justifiably concerned about a problem of circularity arising from Ameritech's argument against any diminution in share values. *See 1990 Rate Represcription,* 5 F.C.C.R. at 7521, ¶ 116 & n. 186. Since stock values are in part a function of expected earnings, the FCC was worried that if it ever set a rate above the required level, the resulting increased stock values would require the Commission to perpetuate a rate that was too high. *Id.* FERC, the agency this court criticized in *Farmers Union,* now seeks to avoid a similar problem. *See Generic Determination of Rate of Return on Common Equity for Public Utilities,* 53 Fed.Reg. 3339, 3347–48 (1988); *Orange & Rockland Utilities, Inc.,* 95 P.U.R.4th 451, 452–53 (1988). Ameritech provides no compelling reason to reject the FCC's interest in avoiding such a result.

■ As Ameritech sees it, "no DCF methodology can satisfy the comparable earnings standard," the second of the two *Hope* tests.[11] Ameritech Brief at 31. Ameritech's conclusion rests on the premise that regulated companies are entitled to a return on book equity similar to comparable risk companies. Because DCF does not estimate a return based on book equity values, Ameritech argues, the return DCF yields cannot be comparable. Ameritech's error is in interpreting the Supreme Court standard as inflexibly requiring an analysis of the book equity of other firms. The Supreme Court only requires that investors receive a return commensurate with "the

risk of the enterprise." *Duquesne Light,* 488 U.S. at 314, 109 S.Ct. at 619. The FCC is "not bound to the use of any single formula or combination of formulae in determining rates." *Hope,* 320 U.S. at 602, 64 S.Ct. at 287; *see 1990 Rate Represcription,* 5 F.C.C.R. at 7520, ¶ 113.

Contrary to the implications of Ameritech's argument, the FCC did in fact consider evidence of the rate of returns for other companies. The FCC compared the DCF estimates for the RHCs to those of companies in the S & P 400, a group of industrial companies. *1990 Rate Represcription,* 5 F.C.C.R. at 7508, ¶ 4 & 7528, ¶¶ 182–83. The Commission found that the ranking in 1990 within the S & P 400 of the average DCF estimate for RHCs had fallen relative to 1986. *Id.* at 7528, ¶ 183. The Commission noted that this finding reinforced its earlier conclusion that an upward adjustment to the DCF rates might be necessary. *Id.* The FCC also considered the cost of equity in both large electric companies and state regulatory rate-of-return determinations in developing its estimate of the range of reasonable rates. *Id.* at 7528, ¶¶ 184, 186.

Ameritech nonetheless champions an alternative methodology based on the earnings on book equity of comparable firms. Yet such an approach is subject to criticisms at least as damning as those Ameritech aims at DCF. *See* KOLBE ET AL., *supra* p. 1259, at 41–53; BONBRIGHT ET AL., *supra* p. 1259, at 329–30; BREYER & STEWART, *supra* p. 1258, at 239–40. Finding unregulated companies of comparable risk is an extremely tricky process. Accounting principles can result in financial statement income and book asset values that differ significantly from actual cash flows and current asset values, respectively. Book return figures of existing companies do not include the poor results of failed companies, causing returns on book equity to be systemically biased upward. This list of

---

11. Apparently not all the RHCs agree with Ameritech's general objection to DCF methodology. Southwestern Bell supported a more elaborate, "multi-stage" DCF model. *1990 Rate Represcription,* 5 F.C.C.R. at 7521, ¶ 121. Bell Atlantic defended the use of a "cluster analysis" that employed classic DCF methodology. *1991 Rate Reconsideration,* 6 F.C.C.R. at 7198–99 & n. 70, ¶ 35.

criticisms of a comparable company methodology is not comprehensive, but it gives a sense of the relative merit of Ameritech's proposal. DCF may give an appearance of exactness where none exists. *See, e.g.,* Whittaker, *supra* note 8, at 269–86; CHARLES F. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES 356–58 (1984). But so do the other methods urged upon the FCC for estimating the cost of equity.

For the foregoing reasons, we do not find persuasive Ameritech's protest of the FCC's combination of methodologies.

### B

■ In addition to its challenge to the combination of a classic DCF rate and an original cost rate base, Ameritech claims that the *Rate Base Orders* will result in an unconstitutional taking of investors' property. The FCC includes in the interstate access rate base "plant used and useful in the efficient provision of interstate telecommunications services." 47 C.F.R. § 65.-800. The test to be applied to this policy, again, is whether the "end result" meets the *Hope* standards: attraction of capital and compensation for risk. *See Duquesne Light,* 488 U.S. at 310, 312, 109 S.Ct. at 617, 618. If it does, the FCC has no obligation to use the "prudent investment" rule Ameritech advocates, that is, to include in the rate base all actual costs for investments prudent when made. *See id.* at 309, 315–16, 109 S.Ct. at 616, 619–20.

Ameritech contends that the rate of return does not adjust for the disallowance of prudent investments. *See Williston Basin Interstate Pipeline Co. v. FERC,* 931 F.2d 948, 954 n. 6 (D.C.Cir.1991). There is always the risk that the "used and useful" rule will exclude part of the original investment from the rate base. The FCC held that because investors are aware of its rate base policies, the agency's market-based methodologies for determining the rate of return will produce a rate high enough to compensate for that risk. *1990 Rate Represcription,* 5 F.C.C.R. at 7521, ¶ 120. Whether a DCF rate *does* compensate for the risk of disallowance has been questioned. *See* A. Kolbe & W. Tye, *The Fair Allowed Rate of Return with Regulatory Risk,* 1992 RES. L. & ECON. 129, 142–50; S. Williams, *Fixing the Rate of Return After Duquesne,* 8 YALE J. ON REG. 159, 160 (1991). But Ameritech has failed to provide sufficient evidence or argument to convince us that the DCF rate *does not* compensate for such risk. Ameritech also asserts that the FCC's reliance on RHC data renders useless the rationale, but as we explain *infra* pp. 1264–65, we do not agree with this particular objection.

Even assuming the DCF rate of return fails to cover the RHCs' losses from the disallowance of prudent investments, Ameritech has not shown that a "used and useful" rate base is unconstitutional. There simply has been no demonstration that the FCC's rate base policy threatens the financial integrity of the RHCs or otherwise impedes their ability to attract capital. *Compare Jersey Cent. Power & Light,* 810 F.2d at 1171–72; *see Duquesne Light,* 488 U.S. at 312, 109 S.Ct. at 618. The FCC wrote: "Notably, Ameritech neither identifies any disallowance that must be compensated for in the rate of return calculation nor estimates the aggregate size of these disallowances." *1990 Rate Represcription,* 5 F.C.C.R. at 7521, ¶ 119. In this appeal, Ameritech makes only an unsupported and unexplained assertion that the amount of the disallowance is two billion dollars. Ameritech bears a "heavy burden" in a case such as this, *Hope,* 320 U.S. at 602, 64 S.Ct. at 287, a burden it has failed to carry. We are therefore not persuaded that the net effect of the FCC *Rate Base Order* and *Rate of Return Order* violates the Fifth Amendment's taking clause.

■ The FCC's position on depreciation, one of the issues this court remanded in *Illinois Bell,* is also constitutionally acceptable. Our earlier decision provides a detailed description of the relevant policy, and the petitioners' critique. *Illinois Bell Tel.,* 911 F.2d at 783–84. The source of the alleged problem is a lag between the time at which companies record depreciation of an asset, thereby removing it from the rate base, and the time at which the company

collects the revenue that compensates it for the depreciation cost. The FCC acknowledges that this lag exists, but states that the market-based rate of return reflects and compensates for this disallowance. *1991 Rate Base Remand Order*, 7 F.C.C.R. at 298, ¶ 14. The FCC has consistently applied a specific rate base policy that affects similarly all asset investments; the depreciation lag rule has been in place since 1977. *See id.; Illinois Bell Tel.*, 911 F.2d at 783. Given the certainty, consistency, and routine nature of this depreciation policy, the FCC reasonably concluded that investors would be aware of the policy and that market prices would have adjusted accordingly. *1991 Rate Base Remand Order*, 7 F.C.C.R. at 298, ¶ 13. And again, Ameritech provides no convincing evidence that the actual financial impact of any uncompensated loss creates a problem of constitutional dimensions.[12]

## C

⬛ We now turn to petitioners' more conventional challenges. Despite Ameritech's claims, the FCC acted reasonably in using RHC data in its DCF calculations. Since return is a function of risk, the FCC sensibly sought out companies with risk characteristics similar to those of the interstate access business. RHCs provide interstate access services through their BOCs, as well as a variety of other regulated and unregulated services. Ameritech suggests that the FCC itself admitted that high RHC market-to-book ratios, which as of March 1990 ranged from 1.54:1 to 2.93:1, "tell us little about the required return on interstate access services." *1990 Rate Represcription*, 5 F.C.C.R. at 7520, ¶ 115. In context, that statement fails to serve Ameritech's purpose. The passage containing the Ameritech quotation reads in full:

> [M]arket-to-book ratios greater than one have been viewed traditionally as possible indicators that the company's return

is greater than its required return. The high market-to-book ratios that the RHCs enjoy today are probably related to their nonregulated activities and tell us little about the required return on interstate access services.

*Id.* The FCC was simply observing, rationally in our view, that it could not determine whether the current rate of return on interstate access service was too high or too low by simply looking at current market-to-book ratios; as the Commission stated in the *1991 Rate Reconsideration*, the Commission did not seek to push market-to-book ratios down to one. 6 F.C.C.R. at 7196, ¶ 17.

This aspect of the RHC data does not make the FCC's use of such figures in the DCF formula arbitrary or capricious. Given that the RHCs earned approximately 80% of their revenues from regulated activities, the FCC was on solid ground in finding that "the primary business of the RHCs is still regulated telephone service." *1990 Rate Represcription*, 5 F.C.C.R. at 7517, ¶ 83. To the extent the riskiness of the other regulated activities was similar to that of interstate access services, and Ameritech does not show how the risks were markedly different, the rate of return the DCF model generates would remain useful.

The FCC also made reasoned adjustments to its estimate of the rate of return to account for the impact of activities other than interstate access service. The Commission considered the argument that the involvement of the RHCs in operations riskier than their regulated telephone services increased their overall cost of capital, and adjusted its estimate accordingly. *1990 Rate Represcription*, 5 F.C.C.R. at 7517, ¶ 86 & 7529, ¶ 188. Various parties to the FCC proceedings also complained that *g*, the growth factor in the DCF equation, did not fully account for future returns on long term, high growth cellular

---

**12.** We do not consider Ameritech's argument that the FCC's treatments of the depreciation lag and plant acquisition costs in the *1991 Rate Base Remand Order* are impermissibly inconsistent. Ameritech did not raise this issue in proceedings before the FCC; the Commission thus "has been afforded no opportunity to pass" on the argument, as the applicable statute requires. 47 U.S.C. § 405(a); *see Action for Children's Television v. FCC*, 906 F.2d 752, 755 (D.C.Cir. 1990).

operations. After evaluating these arguments, the FCC accounted for a possible increase of the DCF estimate by 75–100 basis points due to this "cellular effect." *1990 Rate Represcription,* 5 F.C.C.R. at 7519, ¶ 102 & 7529, ¶ 188. Such adjustments reflect an appreciation of the shortcomings of using RHC data in the DCF model and a reasonable accommodation.

## D

██ The *1990 Rate Represcription* lowered the rate of return the FCC had established in 1986. *See generally Authorized Rates of Return for the Interstate Services of AT & T Communications and Exchange Telephone Carriers,* 60 Rad. Reg.2d (P & F) 1589 (1986) (*"1986 Rate Prescription"*). Comparing cost of equity indices in 1986 and 1990, BellSouth offers two arguments to show that the FCC abused its discretion. The first is that DCF rate of returns on RHC equity increased between 1986 and 1990, implying that the FCC should have raised, not lowered, the rate of return. As the FCC pointed out in the *1991 Rate Reconsideration, see* 7 F.C.C.R. at 7202, ¶ 56, this comparison erroneously relies on data from the third quarter of 1986, a quarter that ended *after* the FCC issued its 1986 rate order. Thus thwarted, BellSouth in its reply brief tries to salvage the argument by pointing to the FCC decision in the *1990 Rate Represcription* to make an upward adjustment of 75 to 100 basis points for the "cellular effect." *See* 5 F.C.C.R. at 7519, ¶ 102. BellSouth claims that the FCC never made such an adjustment. BellSouth inexplicably ignores the FCC's further decision to make a downward adjustment in the rate to account for the RHC's non-interstate access activities. *See id.* at 7529, ¶ 188. The cancelling effect of the adjustments renders this BellSouth claim all but frivolous.

BellSouth also argues that interest rates increased between 1986 and the date of the FCC's order, and that this phenomenon should have prevented the FCC from reducing the cost of equity. But the FCC did not adopt in 1986, nor did it adopt in 1990, a principle requiring a fixed spread between interest rates and cost of equity. *See 1986 Rate Prescription,* 60 Rad.Reg.2d (P & F) at 1602, ¶ 34; *1990 Rate Represcription,* 5 F.C.C.R. at 7527, ¶ 173. The return on stocks may be related to interest rates. But the relatively minor fluctuations on which BellSouth relies, ranging from .4% to 2.1%, *see 1990 Rate Represcription,* 5 F.C.C.R. at 7527, ¶ 170, mean little in the absence of a stated intent to rely on a risk premium methodology based on interest rates. The FCC has not adopted such a methodology, and BellSouth's attempt to foist such a scheme upon the Commission must fail.

## E

██ The FCC's actions easily survive BellSouth's procedural attacks. BellSouth claims that the Commission arbitrarily changed its interpretation of the Part 65 regulations governing interstate rate of return prescription (47 C.F.R. §§ 65.1–65.830) to permit the use of the classic DCF methodology. This purported change, BellSouth argues, was especially capricious because the FCC was conducting rulemaking proceedings to modify the existing regulations. The Commission, though, has always construed Part 65 to permit the use of classic DCF information. The FCC thus had no obligation to adopt the classic DCF methodology in pending rulemaking proceedings before issuing the *Rate of Return Order.*

The FCC's interpretation of Part 65 has from the beginning allowed for rate calculation methodologies other than those explicitly spelled out in Part 65. The FCC promulgated the order addressing Part 65 coverage on August 25, 1986, the same date that it issued its order on reconsideration of its 1986 rate of return prescription. *Authorized Rates of Return for the Interstate Services of AT & T Communications and Exchange Telephone Carriers,* 104 F.C.C.2d 1404 (1986) (*"Part 65 Reconsider-*

*ation*"); *1986 Rate Prescription*, 60 Rad. Reg.2d (P & F) 1589. The *Part 65 Reconsideration* specifically provided for the use of a "more classic DCF model" as well as the historical DCF model the Part 65 regulations included. 104 F.C.C.2d at 1426, ¶ 48; *see 1990 Rate Represcription*, 5 F.C.C.R. at 7509, ¶ 18. In the *1986 Rate Prescription*, the Commission rejected arguments that Part 65 permitted only the use of data supporting methodologies those regulations described. 60 Rad.Reg.2d (P & F) at 1594–95, ¶¶ 10–11. The FCC gave the results of classic DCF calculations "considerable weight," noting that the methodology "received universal support from the parties." *Id.* at 1604, ¶ 41.

 The 1986 use of classic DCF methodology and data constituted a reasonable application of the Part 65 regulations. Part 65 does list categories of data for the RHCs to submit. *See* 47 C.F.R. §§ 65.200–65.400. But the regulations specifically provide that carriers "may include relevant evidence other than the data prescribed by part 65." 47 C.F.R. § 65.102(a). The FCC, through the Common Carrier Bureau, "may require from carriers providing interstate services . . . data or studies that are reasonably calculated to lead to a full and fair record." *Id.* The Commission acquired classic DCF data through such a request. *See 1990 Rate Represcription*, 5 F.C.C.R. at 7508, ¶ 4. Nowhere does Part 65 state that the Commission cannot employ the additional data and related methodologies that § 65.102 may generate; one would hardly expect such a limitation.

A review of the development of Part 65 confirms that the regulations permit the FCC to consider a broad array of evidence. The original version of § 65.102 provided that "[o]nly those rate of return submissions permitted or required by Part 65 shall be considered in proceedings to determine the authorized rate of return for interstate services." *Interstate Services of AT & T Communications and Exchange Telephone Carriers*, 51 Fed.Reg. 1795, 1809 (1986). *At the urging of BellSouth*, the FCC amended § 65.102 "to permit participants to include relevant evidence in addition to prescribed data." *Part 65 Reconsideration*, 104 F.C.C.2d at 1440, ¶ 80; *see* 51 Fed.Reg. 32,922 (1986). This principle was implemented in the *1986 Rate Prescription*. *Part 65 Reconsideration*, 104 F.C.C.2d at 1440, ¶ 80. In its entirety, BellSouth's complaint about the current *Rate of Return Order* is essentially that the FCC made use of classic DCF data rather than the other additional material the RHCs submitted. What the FCC said about similar objections in 1986 remains true today: "The carriers' arguments that evidence submitted pursuant to grant of their waiver requests may be considered part of the record, but that evidence submitted in response to Bureau requests for relevant evidence may not be considered, highlights the weakness of the carriers' objections." *1986 Rate Prescription*, 60 Rad.Reg.2d (P & F) at 1594, ¶ 11.[13]

*Petitions denied.*

---

**13.** BellSouth objects that the FCC cannot estimate the next year's dividend ($D$) in the DCF formula by multiplying current annual dividend levels by half the IBES growth estimate. BellSouth Brief at 24–25. In claiming that this approach contradicts the FCC's earlier practice, BellSouth has misinterpreted the 1986 FCC orders. The FCC noted then that using .5g to grow the dividend was a "more accurate measure," *1986 Rate Prescription*, 60 Rad.Reg.2d (P & F) at 1605, ¶ 44, and gave estimates based on this adjustment "slightly greater weight," *id.* at 1616, ¶ 82. The Commission did not act arbitrarily in deciding to use only the .5g adjustment in its more recent calculations. *See 1990 Rate Represcription*, 5 F.C.C.R. at 7514, ¶ 66.